# In the United States Court of Federal Claims

No. 17-508C
(Filed Under Seal: July 28, 2017)
(Reissued for Publication: August 21, 2017)[*]

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| HARKCON, INC., | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | * |
| | * |
| THE UNITED STATES, | * |
| | * |
| Defendant, | * |
| | * |
| and | * |
| | * |
| METRIS, LLC, | * |
| | * |
| Defendant-Intervenor. | * |

Post-Award Bid Protest; Judgment on the Administrative Record; Appearance of Impropriety; Actual Impropriety; Organizational Conflict of Interest; Procurement Integrity Act; Fully Informed Disinterested Observer; Technical Evaluation; Blue & Gold Fleet Waiver; Agency Discretion

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Richard S. Toikka, Washington, DC, for plaintiff.

Michael Austin, United States Department of Justice, Washington, DC, for defendant.

Otto S. Shill, III, Phoenix, AZ, for defendant-intervenor.

## OPINION AND ORDER

**SWEENEY**, Judge

    In this bid protest, plaintiff Harkcon, Inc. ("Harkcon") challenges the award of a multiyear Indefinite Delivery Indefinite Quantity ("IDIQ") Training and Analysis Support Services ("TASS") contract by the United States Coast Guard ("Coast Guard") to defendant-intervenor Metris, LLC ("Metris"). Currently before the court are the parties' cross-motions for judgment on the administrative record. As explained below, because the court finds that the

---

[*] The court issued this Opinion and Order under seal on July 28, 2017, and directed the parties to submit proposed redactions. This reissued Opinion and Order incorporates the redactions proposed by the parties, with some modifications and other nonsubstantive typographical changes. All redactions are indicated by a bracketed ellipsis ("[. . .]").

Coast Guard did not act arbitrarily, capriciously, or contrary to law, it denies Harkcon's motion for judgment on the administrative record and grants Metris's and defendant's cross-motions for judgment on the administrative record.

# I. BACKGROUND

Since May 1, 2011, Harkcon has been a major subcontractor on an IDIQ contract to provide the Coast Guard with Training and Technical Support Services ("TTSS")—the contract that was being replaced by the TASS contract.[1] AR 196-98, 875, 3056.  Captain Gary Bruce was chief of the Coast Guard's Force Readiness Command ("FORCECOM") Training Division ("FC-T") during much of this time, from June 2012 until entering terminal leave status on March 1, 2015, prior to his retirement from the Coast Guard on May 1, 2015.[2] Id. at 212, 1443.  The FC-T is responsible for "development, oversight and execution of all formal Coast Guard training and educational policies."  Id. at 213; accord id. at 766, 1235.  As head of the FC-T, Captain Bruce directly supervised the commanding officers of each of the Coast Guard Training Centers ("TRACENs"), id. at 1452, overseeing "100+ program management staff and 16 Training Commands nationwide representing 2800+ personnel," id. at 579; accord id. at 1098.  The FORCECOM Business Division ("FC-B") is responsible for business administration functions, including contract management, across all FORCECOM divisions.[3] Id. at 1443-44; see also id. at 1446-47, 1455 (discussing the working relationship between FC-T and FC-B).  Following his retirement from the Coast Guard, Captain Bruce was hired by Metris to be its program manager on the TASS contract at issue in this protest.  Id. at 574, 1443.

## A. The TTSS Contract

Under the TTSS contract, the FC-B and the FC-T worked "in tandem," with the FC-T "provid[ing] input on technical requirement and personnel needs" and the FC-B "perform[ing] the contract functions" in conjunction with the Coast Guard Office of Contract Operations, Formal Contracts Division I ("CG-9121").  Id. at 1237.  Contracting officer representative ("COR") responsibilities for the TTSS contract as a whole were assigned to the FC-B's Business Operations Branch ("FC-Bop").  Id.  In addition, CORs for each task order issued under the TTSS contract were located on-site at TRACENs or field level organizations.  Id. at 1464.  Invoice approval was executed by either the on-site COR or the overall COR "in collaboration with the CG-9121 Contract Specialist and Contracting Officer."  Id. at 1237.

Captain Bruce was viewed as "the Program Manager [on the TTSS contract] for training by default of [his] position" as the FC-T division chief.  Id. at 1456.  He was kept informed of performance issues, worked with the FC-B division chief to approve task orders (which included

---

[1]  The facts in this section are derived from the administrative record ("AR").

[2]  FORCECOM is organized into five divisions:  (1) Tactics, Techniques, and Procedures; (2) Exercise Support; (3) Training; (4) Assessment; and (5) Business.  AR 1347.

[3]  FC-B was formerly under the FC-T's umbrella before being reorganized as a separate, peer FORCECOM division prior to Captain Bruce's arrival in 2012.  AR 1238, 1444, 1456.

assessing their overall cost), and was familiar with general Coast Guard training needs, but his involvement was a high-level overview rather than working with the day-to-day details. Id. at 1456, 1462; see also id. at 1421 (noting that Captain Bruce "was not privy to invoices"), 1462 (explaining that the scope of Captain Bruce's responsibilities as the FC-T division chief prevented him from getting "too deep in the weeds" with respect to the TTSS contract), 1969-70 (stating that Captain Bruce did not work with any incumbent contractor employees), 2373-74 (providing an example of Captain Bruce's involvement). Captain Bruce's deputy division chief, David Walts, while viewing himself as "basically the supervisory Program Manager" of the TTSS contract during the TASS procurement before his retirement on January 1, 2015, reported that the contracting officer and CORs handled the majority of TTSS-related work and that his involvement was minimal. Id. at 1399-400. Contracting specialist Alan Boucher stated that he was responsible for administering the TTSS contract, including working on task orders, coordinating with CORs, and paying invoices. Id. at 1420.

### B. Planning and Development of the Request for Proposals

The initial planning for the TASS procurement began in January 2014, approximately two years prior to the expiration of the TTSS contract.[4] Id. at 1478. Then-contracting officer Robert Mann-Thompson provided a PowerPoint presentation concerning contract support services for FORCECOM training systems to Captain Bruce, Mr. Walts, then-COR on the entire TTSS contract Lieutenant Commander Malcolm Mark,[5] and FC-B division chief Lizette Medina. Id. at 1237-38, 1486, 1489. A major goal of the TASS procurement was to "significantly reduce the number of modifications needed" to the contract once it was awarded by engaging in early planning. Id. at 1478. Mr. Mann-Thompson emphasized the need for a point of contact from FC-T rather than FC-B for the TASS procurement so that "technical questions" could be addressed directly rather than by relaying information between the two divisions. Id. at 1478-79.

Mr. Walts designated Commander Timothy Hammond as the FC-T technical point of contact, but specified that COR duties should remain in the FC-B. Id. at 1478. Approximately three months later, in April 2014, Mr. Walts named Commander Scott Casad as the new program manager for the TASS procurement following Commander Hammond's transition into a new role. Id. at 1503-05. Commander Casad was chief of the FC-T Mission Support Branch ("FC-Tms") before becoming training chief at TRACEN Yorktown in May 2015. Id. at 1438. One month later, in May 2014, after the expectations for the program manager role had changed, Mr. Walts highlighted his expectation that the TASS procurement would require the FC-B to provide contracting guidance to the FC-T and designated Commander Burst Roethler as the program manager for the procurement. Id. at 1557. At the time, Commander Roethler led the FC-T Operations Branch ("FC-Tot"). Id. at 1472. He served as FC-Tot branch chief and program manager for the TASS procurement until being reassigned to Airstation Sacramento in July

---

[4] Bridge contracts have been in place since the expiration of the TTSS contract. Order, April 17, 2017.

[5] When Lieutenant Commander Mark retired from the Coast Guard in March 2015, Lieutenant Commander Patricia Ferrell assumed COR responsibilities for the TTSS contract. AR 1237.

2015, when Commander Randall Chong assumed the branch chief and program manager roles. Id. at 1472, 1476.

On May 29, 2014, Mr. Walts informed FORCECOM unit commanders and senior leadership that the TASS procurement had officially commenced, reminding them that representative visits from contractor personnel or other potential bidders required contracting officer approval, and designated Commander Roethler as the FC-T's COR for the TASS procurement. Id. at 1576. A series of electronic-mail messages from July 9-15, 2014, addressed the labor rates to be used in the Independent Government Cost Estimate ("IGCE") for the TASS procurement. Id. at 1396-98. Mr. Mann-Thompson specified that the rates from the TTSS contract should be increased by 26.1 percent to determine the first-year labor rates for the TASS procurement because the TTSS labor rates were low and outdated, and then increased by 5 percent annually for each additional year of the new contract. Id. at 1396. Commanders Chong and Roethler were the primary authors of the IGCE. Id. at 1473.

On July 15, 2014, a Request for Information ("RFI"), which included a draft Performance Work Statement ("PWS"), was posted on the FedBizOpps website. Id. at 191. Mr. Boucher worked with Mr. Mann-Thompson, Commander Steven Ramassini,[6] Commander Chong, Commander Roethler, Commander Casad, and the CORs located at the various TRACENs throughout the TASS procurement. Id. at 1421-22, 1472. Commanders Chong and Roethler were the primary authors of the PWS. Id. at 1473. The purpose of the RFI was to "seek[] information to assist[] in the formulation of an acquisition strategy" for the TASS procurement and to "seek[] feedback from industry on the Draft PWS." Id. at 191. Specifically, the Coast Guard sought only brief capability statements, recommendations or concerns with respect to the draft PWS, and an indication of whether the respondent was likely to submit a bid if a formal solicitation was later issued. Id.; see also id. at 1046-75 (containing the draft PWS attached to the RFI). The draft PWS included requirements for key personnel:

> **1.3.2.1 Program Manager.**
>
> Program Manager is further designated as <u>Key Personnel</u> by the [Coast Guard].
>
> - Must possess a Master's degree in an Education, Business, or Management related field.
>
>   . . . .

_____

[6] Commander Ramassini took over as the FC-Tms branch chief in July 2015, AR 1468, following Commander Casad's reassignment to TRACEN Yorktown. Prior to his arrival at FC-Tms, Commander Ramassini was stationed in Hawaii, id., and thus would not have been involved in the RFI portion of the TASS procurement. Although he and Captain Bruce knew each other, he never worked in Captain Bruce's chain of command. Id. at 1452, 1469.

### 1.3.2.2 Site Team Leads.

Site Team Leads are further designated as <u>Key Personnel</u> by the [Coast Guard].

- Must possess a master's degree in an Education, Business, or Management related field.

<u>Id.</u> at 1047-48.

Nineteen vendors, including Harkcon but not including Metris, responded to the RFI prior to its August 5, 2014 deadline.  <u>Id.</u> at 1580-82, 1605; <u>see also id.</u> at 193-211 (Harkcon's response to the RFI).  Harkcon provided comments regarding the draft PWS in its response, but did not address the proposed requirements for the Program Manager or Site Team Lead positions.  <u>Id.</u> at 210-11.  On October 16, 2014, Mr. Mann-Thompson approved the Market Research Report that incorporated, among other documents, responses to the RFI.  <u>Id.</u> at 1602-08.  The Market Research Report was developed by Mr. Mann-Thompson, Mr. Boucher, and Commander Roethler, and provided for the TASS procurement to be conducted as a small business set-aside.  <u>Id.</u> at 766, 1603, 1607.  The Acquisition Plan for the TASS procurement was formally approved on February 5, 2015.  <u>Id.</u> at 766.

### C.  Captain Bruce Retires from the Coast Guard

In January 2015, Captain Bruce was contacted by Pharos Group Inc. ("Pharos") concerning post-retirement work as Project Manager on a Coast Guard contract.  <u>Id.</u> at 212, 1443, 2625.  Captain Bruce replied that he needed to obtain an ethics opinion before holding any further discussions.  <u>Id.</u> at 1443.  Captain Bruce informed his superiors that he was contacted by several contractors regarding post-retirement work, but would not hold any discussions until he received an ethics clearance.  <u>Id.</u> at 1444.

On January 13, 2015, Captain Bruce submitted a Post-Government-Service Employment Questionnaire to the Coast Guard Legal Command.  <u>See generally id.</u> at 2621-28.  In his questionnaire, Captain Bruce reported that Pharos planned to "bid[] on the renewal of FORCECOM's Training Support Contract,"[7] and that the new contract "would represent the majority of the contract personnel that work at or around the Coast Guard training system in an array of positions."  <u>Id.</u> at 2625.  He also reported that although he received occasional updates and briefings regarding the TTSS contract and how the TASS procurement would be conducted, (1) he never served as a contracting officer or COR, (2) he was not part of a contract evaluation team, (3) he was not involved in developing the requirements concerning the TASS procurement, and (4) FC-T's finance and business operations were primarily housed within FC-B.  <u>Id.</u>

---

[7]  Rather than bidding as a prime contractor, Pharos was included in Metris's bid as a subcontractor.  AR 574; <u>see also id.</u> at 1976 (discussing the relationship between Pharos and Metris).

Captain Bruce began terminal leave on March 1, 2015.  Id. at 212, 1443.  On March 19, 2015, he received a Post-Government-Service Employment Ethics Memorandum ("ethics memo").  See generally id. at 212-16.  According to the ethics memo, Captain Bruce was cleared to "accept employment with Pharos and . . . begin work upon [his] official retirement from the [Coast Guard]."  Id. at 212.  The Coast Guard recognized that, as FC-T division chief, Captain Bruce was

> responsible to FORCECOM for development, oversight and execution of all formal Coast Guard training and educational policies.  Specifically, [he was] the immediate supervisor of Commanding Officers of eight major training commands as well as all training finance and business operations located with the FORCECOM business division (excluding FC-T) . . . [and] did not personally serve as a Contracting Officer[, COR], or on a contract evaluation team . . . .

Id. at 213; see also id. at 2625-26 (containing Captain Bruce's description of his Coast Guard responsibilities during the two years preceding his retirement).  In his anticipated role with Pharos, the Coast Guard contemplated that Captain Bruce would serve as the full-time Project Manager working on Coast Guard installations and at Coast Guard headquarters, and that as the Project Manager he would be "the designated Key Personnel contractor employee responsible for all contractor work performed on the contract," would be "the single point of contact for the [contracting officer] and the COR," and would "interact[] with other active duty Coast Guard personnel."  Id.

In addition, the Coast Guard noted that, prior to beginning terminal leave, Captain Bruce did not make any decisions that had a "direct and predictable effect on Pharos's financial interests," was never "involved in any particular matters that dealt with Pharos," and did not have or would not have had the opportunity to "participate personally and substantially in a particular matter . . . that [would have had] a direct and predictable effect on Pharos" prior to his official retirement.  Id.  The Coast Guard further determined that Captain Bruce was "never directly involved with contract discussions related to Pharos," "did not evaluate any potential Coast Guard contract with Pharos," did not "serve as a [contracting officer technical representative ('COTR')] for any Pharos contract review," and "did not supervise anyone who was assigned to work on a Pharos contract as a part of his/her official duties," including supervision of "anyone who may have been involved with the procurement of a Pharos contract (either active or pending within the last year) or who may have been a COTR for a Pharos contract review."  Id. at 213-14.

In the ethics memo, Captain Bruce was also warned that he was precluded, pursuant to 18 U.S.C. § 207(a)(1), "from ever knowingly appearing before or making a representational communication or representational contact with any person in the Executive or Judicial Branches of the Federal Government on behalf of any non-federal third party in connection with any of the same particular matters that [he] personally and substantially participated in" while a Coast Guard officer.  Id. (footnote omitted).  Excluded from the definition of a representational communication or contact were

- mere (passive) presence at a meeting with federal officials on behalf of a private sector employer . . . unless, because of [his] former federal grade or position, [his] mere presence would influence a federal official;

- requesting or passing factual or status information from or to a federal official on behalf of a private sector employer; and

- social contacts.

Id. at 214-15.  However, the lifetime restriction against representational communications did "not in any way restrict in-house ('behind the scenes') employment activities for any new employer."  Id. at 215.  Since Captain Bruce was not involved in any contracts or other matters between the Coast Guard and Pharos, and he was never required to communicate with Pharos employees, the Coast Guard determined that it was "unlikely that [he] will be considered to have 'substantially' participated in a particular matter."  Id.

Furthermore, Captain Bruce was cautioned regarding a "similar, but wider and shorter post-retirement representational restriction" pursuant to 18 U.S.C. § 207(a)(2) that pertains "only to the same particular matters that were pending under [his] official responsibility (cognizance) during [his] last year of federal service."  Id.  Specifically, Captain Bruce was advised that

> [i]f during [his] last year of Coast Guard service, a particular matter came within [his] official cognizance, [he was] precluded for a two-year period from the date of [his] official retirement date . . . from representing any non-federal third party on that same particular matter to any part of the Executive or Judicial Branches of the Federal Government.

Id.  However, the Coast Guard determined that it was "unlikely that the two-year representational restriction will apply to [his] circumstances" because "any particular matter related to Pharos should not be considered to be pending under [his] 'official responsibility'" and he "had no direct administrative or operating authority to approve or disapprove a Pharos contract or particular matter," was "not an agency head," and "never supervised anyone who actually participated in the particular matter pending during the last year or who had been assigned to the particular matter as a part of his/her official duties."  Id. at 215-16.

Finally, the ethics memo contained a discussion regarding the Procurement Integrity Act ("PIA"), 41 U.S.C. §§ 2101-2107 (2012).  AR 216.  Specifically, although Captain Bruce was informed that the PIA did not appear to apply to his circumstances, he was advised that the PIA nevertheless continued to protect any "source selection or contractor bid or proposal information" to which he may have had access.  Id.  Ultimately, Captain Bruce was given "no restrictions to [his] post-government employment with Pharos after [his] official retirement date from the Coast Guard."  Id.

Although he did not "know who Metris was at the time" he received the ethics memo, Captain Bruce emphasized that, before he left the Coast Guard, he took steps to ensure that he would be "free and clear legally" to assist a potential contractor in developing its proposal. Id. at 1453; accord id. at 2625-26. Following his official retirement on May 1, 2015, id. at 212, 1443, Captain Bruce worked as an independent consultant for Metris after Metris evaluated his prior involvement with the TASS procurement, id. at 1447, 1450, 1976, 2554-55. As a subject matter expert, Captain Bruce provided input on FORCECOM Standard Operating Procedures ("SOPs") and human performance technology to assist Metris in developing the technical portion of its proposal. Id. at 1448, 2553-55. He had no involvement with the management, staffing, or pricing portions of Metris's proposal, although he occasionally offered thoughts regarding individuals proposed for key positions. Id. at 1448, 1451, 2553-55.

### D. The Request for Proposals

The Request for Proposals ("RFP") for the TASS procurement "started coming together in April 2015," and a few months later, in June or July 2015, the RFP "was switched from [a Federal Acquisition Regulation ("FAR")] Part 12 to a FAR Part 15 acquisition." Id. at 1427. On October 9, 2015, the Coast Guard approved the Source Selection Plan, id. at 217, and issued the RFP, id. at 233, 767. As described in the RFP, the Coast Guard sought to award an IDIQ contract with a five-year ordering period that was a "100% Total Small Business Set-Aside." Id. at 234. Specifically, the purpose of the contract is to obtain "instructional, training, and assessment support services . . . includ[ing] performance analysis, instructional systems development (analysis, design, development, implementation, and evaluation), training support services and training delivery." Id. at 329.

The RFP contained, in pertinent part, labor category descriptions listing the necessary skills, training, education, and certification for the various positions, id. at 239-50; the PWS, id. at 251, 278, 329-34; contract administration data, id. at 257-61; applicable clauses from the FAR, id. at 270-77; a labor category rates worksheet, id. at 278, 335; a Performance Requirement Summary, id. at 278, 337-41; instructions to offerors, including an October 19, 2015 deadline to submit questions via electronic mail to the contracting specialist and the contracting officer, id. at 289-90; descriptions of the factors for evaluating proposals, id. at 292-93; Internet links to Coast Guard Training System SOPs, id. at 257, 260, 342; and an Internet link to the applicable wage determinations for positions covered by the Service Contract Act, 41 U.S.C. §§ 6701-6707,[8] AR 348. The RFP also incorporated FAR 52.215-1, id. at 290, which states that the Coast Guard would "evaluate proposals and award a contract without discussions with offerors," FAR 52.215-1(f)(4); accord AR 1433 (stressing that, prior to receiving offers, the Coast Guard had decided not to hold discussions or negotiations). The Coast Guard amended the RFP on five occasions in October and November 2015. Id. at 350, 372, 374, 377, 380, 771-72.

---

[8] FAR 52.222-41, Service Contract Labor Standards, is incorporated into the TASS contract. AR 277.

**1. RFP Requirements**

Offerors were required to submit their proposals in three volumes:  Technical and Management, Past Performance, and Price.  Id. at 378-79.  With respect to the technical and management portion of their proposals, offerors were directed to provide, among other information, (1) "a detailed technical and management plan that demonstrates the capability to perform the prospective contract in accordance with the PWS"; (2) "qualified personnel," including "resumes for all designated key personnel"; and (3) "a staffing approach that demonstrates a capability and understanding of what is needed to recruit, retain, manage attrition, and fill vacancies in support of this contract."  Id. at 378.  According to the RFP, the awardee was required to "provide qualified personnel to perform all requirements specified in task orders awarded under this Contract."  Id. at 260.  Further, pursuant to Section G.2 of the RFP:

> The contractor agrees to assign only personnel who are qualified
> for the applicable labor category.  The contractor shall submit the
> resumes of proposed contractor personnel to the [Coast Guard].
> The [Coast Guard] will review the resumes to determine if the
> proposed contractor personnel meets the qualifications of the
> respective labor category.  Unqualified personnel will be rejected.

Id. at 257.  Both the Program Manager and Site Team Lead positions were designated as key personnel.[9]  Id. at 275-76, 360-61.  Section B.4 of the RFP specified that the Program Manager "[m]ust possess a Master's degree in an Education, Business, Administration, or Management related field[]" and certain professional experience, that a SECRET clearance was "required," and that the Coast Guard "desires, but does not require the Program [M]anager to have [certain certifications]."[10]  Id. at 360.  Section B.4 of the RFP further specified that Site Team Leads "[m]ust possess a Bachelor's degree in an Education, Business, or Management related field" and certain professional experience, and "[m]ay require SECRET clearance" depending on the task order.[11]  Id. at 361.

With respect to the past performance portion of their proposals, offerors were required to "submit at least three (3) relevant past performance references for contracts with the private

_____

[9]  Approval of the contracting officer is necessary for any changes to key personnel.  See AR 275 (incorporating Homeland Security Acquisition Regulation 3052.215-70 into the TASS contract); accord id. at 258 ("The Contractor shall not replace the Program Manager without prior approval from the Contracting Officer.").

[10]  For the TTSS contract, the Program Manager was required to hold a bachelor's degree in education, engineering, or science and have six years of experience in technical training; have a minimum of ten years of experience in technical training, including at least four as a military instructor; or have "[e]quivalent educational credentials and professional experience."  AR 34.

[11]  For the TTSS contract, a Site Team Lead was required to have at least five years of technical program management experience and certain certifications or "[e]quivalent educational credentials and professional experience."  AR 35.

industry or government instrumentalities (Federal, state, or local)" for "past performance services . . . performed within the past three years" or, "[i]f there is no relevant past performance, [to] submit a statement to that effect." Id. at 378.

With respect to the price portion of their proposals, offerors were required, in relevant part, to "provide nationwide rates for all labor categories" as well as the "proposed transition price." Id.; see also id. at 335 (containing the labor category rates worksheet to be completed by offerors). The total evaluated price would be determined from these values. Id. at 382, 799.

## 2. Evaluation Criteria

Offerors were notified that the Coast Guard planned to

> award a contract resulting from this solicitation to the responsible offeror whose offer conforming to the solicitation will be most advantageous to the [Coast Guard], price and other factors considered. Selection under this solicitation shall be based on the responsible offeror whose proposal represents the overall best value for the [Coast Guard] using the tradeoff approach in accordance with FAR 15.3. When combined, the non-price evaluation factors are significantly more important than price. As the non-price factor ratings converge, however, the price may become more important. A best value determination will be made by employing the trade-off approach in accordance with FAR 15.304(e). Of the non-price factors, technical and management approach are approximately equal to relevant past performance. As such, award may be made to other than the lowest priced offeror or other than the highest technically rated offeror. The following factors shall be used to evaluate offers:
>
> **(1) Technical and Management Approach**
>
> The [Coast Guard] will evaluate each offeror's technical and management approach to determine their capability to perform and their understanding of all the requirements outlined in the [PWS]. This will include the evaluation of the following sub-factors:
>
> **(i) [S]ub-factor 1, Technical Approach**
>
> . . . .
>
> **(ii) [S]ub-factor 2, Management Approach**
>
> . . . .

**(iii)  Sub-factor 3, Staffing Approach**

The offeror's proposed staffing approach toward recruiting, retention, managing attrition, and filling vacancies for this contract.

**(iv)  Sub-factor 4, Transition Planning**

. . . .

**(v)  Sub-factor 5, Technical Approach Sample Tasks**

. . . .

Overall rating for the **Technical and Management Approach** (Factor One) will be at the factor level.  All sub-factors are approximately equal and contribute to the overall factor rating.  If revisions are made to any sub-factor(s), Factor One will be re-evaluated.

**(2)  Relevant Past Performance**

The [Coast Guard] will evaluate the offerors' relevant past performance.  Relevant past performance is for services similar, in amount and scope, to the services detailed in the solicitation.  . . . A contractor without a record of relevant past performance or for whom information on relevant past performance is not available will not be evaluated favorably or unfavorably on past performance, but will receive an overall past performance rating of neutral.  . . .

**(3)  Price**

The [Coast Guard] will evaluate price based on the Total Evaluated Price . . . .  The Total Evaluated Price is the summation of the transition services price, and the Proposed Labor Category Rate Total Price.  . . .

Id. at 381-82.

In addition to the above factors and subfactors specified in the RFP, the Source Selection Plan provided that "[a]s strengths, weaknesses, and deficiencies are identified, the associated assessment of risk shall also be evaluated and documented" by the technical evaluation team ("TET").  Id. at 225.  Risk assessment was defined as an "assessment of the probability of success or failure of performance of the solicitation requirements as proposed by an offeror,"

while factoring in "the proposed capability to mitigate the risks present in the proposal." Id. The risk assessments were described in the Source Selection Plan as follows:

    i.    **High (H).** The proposed approach is likely to cause significant disruption of schedule, increase in cost, or degradation of performance even with special contractor emphasis and close government monitoring.

    ii.    **Moderate (M).** The proposed approach can potentially cause some disruption of schedule, increase in cost, or degradation of performance. However, special contractor emphasis and close government monitoring will probably be able to overcome difficulties.

    iii.    **Low (L).** The proposed approach has little potential to cause disruption of schedule, increase in cost, or degradation of performance. Normal contractor effort and normal government monitoring will probably be able to overcome difficulties.

Id.

## E. Proposals

Harkcon, Metris, and three other offerors submitted proposals in response to the RFP. Id. at 766. Captain Bruce was featured in Metris's proposal as its Program Manager for the contract. Id. at 574, 577-79, 602. He had also assisted in developing Metris's proposal as a subject matter expert reviewing SOPs, and participated in recruiting and selecting other personnel to join Metris. Id. at 575, 579, 1448.

Pursuant to the RFP, id. at 378, Metris provided resumes for its key personnel, i.e., Program Manager and Site Team Leads. Captain Bruce reported holding a [. . .], with concentrations in [. . .] and [. . .]. Id. at 602. [. . .], Metris's proposed Assistant Program Manager, reported holding a [. . .].[12] Id. at 607. Metris's proposed Site Team Leads reported holding the following degrees:

[. . .].

Although not required by the RFP, Metris also included a signed letter of intent to provide services from each of its key personnel. Id. at 602-10.

For prior performance, Metris submitted references for the following contracts:

[. . .].

---

[12] [. . .] is also Metris's proposed Site Team Lead for [. . .]. AR 607.

In addition, Metris provided its labor category rates and transition price, id. at 738-39, resulting in a total evaluated price of [. . .], id. at 763.

Harkcon similarly provided resumes for its key personnel. See, e.g., id. at 446. Harkcon's proposed Program Manager is [. . .], who served as Harkcon's Program Manager on the TTSS contract. Id. On behalf of [. . .], Harkcon reported the following:

| Desired Requirements: | Candidate Qualifications: |
|---|---|
| • Master's Degree in an Education, Business, Administration, or Management related field | [. . .] |
| **Minimum Requirements:** | **[Candidate Qualifications:]** |
| • Minimum of 4 years of management experience including supervising supervisors<br><br>. . . .<br><br>• SECRET clearance required | [. . .] |

Id. [. . .] is Harkcon's Alternate Program Manager,[13] and reported holding [. . .]. Id. at 462. For its proposed Site Team Leads, Harkcon organized the requirements contained in the RFP as follows:

**Desired Requirements:**
- Bachelor's Degree in an Education, Business, Administration, or Management related field

**Minimum Requirements:**
- Minimum of 1 year of supervisory experience
- Minimum of 1 year of project management experience
- Proficient in Microsoft Office applications
- SECRET clearance as required per task order

Id. at 448. To meet the "desired requirements," Harkcon's proposed Site Team Leads reported holding the following degrees:

[. . .].

---

[13]  [. . .] is also Harkcon's proposed Site Team Lead for [. . .]. AR 462. He currently serves as Harkcon's [. . .]. Id. at 462-63.

Six of the proposed Site Team Leads reported holding an active SECRET clearance, while two reported that "[c]learance [was] not required." Id. at 448-64. Three of the proposed Site Team Leads currently serve as Site Team Leads for Harkcon at their respective locations, id. at 449, 451, 456, and another serves as the prime contractor's Site Team Lead at his location, id. at 462-63.

For prior performance, Harkcon submitted references for the following contracts:

> [. . .].

In addition, Harkcon provided its labor category rates but did not separately state a transition price, id. at 545-46, resulting in a total evaluated price of [. . .], id. at 571.

## F.  Evaluation of Proposals

Separate teams evaluated the Technical and Management Approach, Past Performance, and Total Evaluated Price factors.

## 1.  Technical Evaluation

According to the Source Selection Plan, the TET was "responsible for conducting a detailed evaluation of the technical proposals with respect to technical and management considerations." Id. at 219. The TET was led by Commander Ramassini, and also included Kathleen Thore from TRACEN Petaluma,[14] James Parry from TRACEN Yorktown,[15] Lieutenant Commander Sean Murray from the Maritime Law Enforcement Academy ("MLEA"),[16] Lieutenant Commander Ronald Nakamoto from the Special Missions Training Center ("SMTC"),[17] Lieutenant Commander Bryan Burkhalter of the Aviation Training Center

---

[14]  Ms. Thore had been TRACEN Petaluma's point of contact regarding development of the PWS. AR 2563. Although she knew Captain Bruce, she never reported to him. Id. at 1452, 2564.

[15]  Mr. Parry was a COR at TRACEN Yorktown, and had worked on task orders for the TTSS contract. AR 2566. Although he knew Captain Bruce, he never reported to him. Id. at 1452, 2567.

[16]  Lieutenant Commander Murray was the Performance Systems Branch chief at the MLEA before becoming the MLEA training officer. AR 2569. The MLEA is part of the FC-T. Id. Although he knew Captain Bruce, he never reported to him. Id. at 1452, 2570.

[17]  Lieutenant Commander Nakamoto was in graduate school prior to reporting to the SMTC in August 2015. AR 2572. The SMTC is located at Camp Lejeune, North Carolina, and is part of the FC-T. Id. He had heard of Captain Bruce, but did not know him and had never reported to him. Id. at 1452, 2573.

("ATC"),[18] and Aviation Electronics Technician Chief Greg Stewart of the Aviation Technical Training Center ("ATTC").[19]  Id. at 219, 1876; see also id. at 1431, 2563, 2566, 2569, 2572, 2575, 2578 (verifying the TET membership).  Contracting officer Richard Murphy "oversaw" the TET process, but did not interact with the TET directly.[20]  Id. at 1431, 1896.

The TET rated the overall Technical and Management Approach for each offeror using the following ratings:

| Technical Rating | Definition |
|---|---|
| Superior | Proposal demonstrates an understanding of the requirements and an approach that significantly exceeds performance or capability standards.  Proposal has strengths that will significantly benefit the [Coast Guard]. |
| Good | Proposal demonstrates an understanding of the requirements and an approach that exceeds performance or capability standards.  Proposal has strength(s) that will benefit the [Coast Guard]. |
| Satisfactory | Proposal demonstrates an understanding of the requirements and an approach that meets performance or capability standards.  Proposal presents an acceptable solution. |
| Marginal | Proposal demonstrates a shallow understanding of the requirements and an approach that does not meet one or more performance or capability standard[s] necessary for minimal but acceptable contract performance.  Deficiencies or weaknesses are correctable through discussions. |

---

[18]  Lieutenant Commander Burkhalter was the Performance Systems Branch chief at the ATC during 2016.  AR 2575.  The ATC is located in Mobile, Alabama, and is part of the FC-T.  Id.  Although he knew who Captain Bruce was, he never reported to or otherwise interacted with him.  Id. at 1452, 2576.

[19]  Chief Stewart is an expert on "ATTC training center requirements and needs."  AR 2578.  The ATTC is located in Elizabeth City, North Carolina, and is part of the FC-T.  Id.  Although he had previously met Captain Bruce, Chief Stewart never worked with him in any capacity.  Id. at 1452, 2579.

[20]  Mr. Mann-Thompson, the procuring contracting officer, was on vacation during the TET's evaluation period.  AR 1430, 1432.

| | |
|---|---|
| Unsatisfactory | Proposal fails to meet requirements and one or more deficiencies exist for which correction would require a major revision or redirection of the proposal. A contract cannot be awarded with this proposal. |

Id. at 229, 773, 1873. At the same time, the TET identified strengths, weaknesses, significant weaknesses, and deficiencies in each proposal using the following definitions:

| Finding | Definition |
|---|---|
| Strength | An element of a proposal which exceeds a requirement of the solicitation in a beneficial way to the [Coast Guard]. |
| Weakness | A flaw in a proposal that increases the chance of unsuccessful performance. |
| Significant Weakness | A flaw in a proposal that appreciably increases the risk of unsuccessful contract performance. |
| Deficiency | A material failure of an offer to meet a [Coast Guard] requirement or a combination of significant weaknesses in an offer that increases the risk of successful contract performance to an unacceptable level. |

Id. at 224, 773, 1873.

The overall ratings assigned to each offeror by the TET were as follows:

| Offeror | Technical Rating | Risk |
|---|---|---|
| [. . .] | Unsatisfactory | High |
| Harkcon | Marginal | Moderate |
| [. . .] | Unsatisfactory | High |
| Metris | Good | Low |
| [. . .] | Unsatisfactory | High |

Id. at 775, 1877.

**a. Harkcon**

The TET found the following numbers of strengths, weaknesses, and deficiencies in Harkcon's proposal:

| Finding | Subfactor 1 Technical Approach | Subfactor 2 Management Approach | Subfactor 3 Staffing Approach | Subfactor 4 Transition Planning | Subfactor 5 Sample Tasks |
|---|---|---|---|---|---|
| Strength | 3 | 2 | – | 1 | – |
| Weakness | – | – | – | – | – |
| Significant Weakness | – | – | – | – | – |
| Deficiency | – | – | 1 | – | – |

Id. at 776; see also id. at 780-81, 1882-83 (discussing the individual items in detail).

In determining a deficiency in Harkcon's staffing approach, the TET identified five resumes that did not meet the educational requirements specified in the RFP:

| Name | Requirement Gap |
|---|---|
| [. . .] | Degree is not in the discipline of Education, Business, Administration or Management related field. |
| [. . .] | Degree is not in the discipline of Education, Business or Management fields. |
| [. . .] | Degree is not in the discipline of Education, Business or Management fields. |
| [. . .] | Does not possess minimum of Bachelor's degree as required.  The resume provided other qualifications, but none are equivalent to a Bachelor's degree. |
| [. . .] | Does not possess minimum of Bachelor's degree as required. |

Id. at 1883; accord id. at 781; see also id. at 778-79, 784, 790 (reflecting that [. . .], [. . .], and [. . .] were also assessed deficiencies due to key personnel failing to attain the minimum educational requirements and/or holding a degree in an unrelated field).  The TET explained:

> The overall risk [for Harkcon's] proposal is determined to be moderate due to deficiencies in the ability to meet the qualification requirements for Program [M]anager and Site Team Leads as outlined in the RFP/PWS.  However, the proposed individuals have significant Coast Guard experience, and have attained Coast Guard Master Training Specialist qualifications, and/or have attended the [Coast Guard] Course Developer Course and Instructor Development Course.  These salient certifications could

-17-

mitigate the risk.  The proposal has multiple documented strengths demonstrating the proposal's robust technical approach which aligns with [Coast Guard] SOPs as well as quality control/assurance and other management approaches.  The Program Manager features [two certifications].  This may enhance the services provided to the [Coast Guard] . . . .  [Harkcon] provided a clear response to . . . Sample Task Order examples[, which] featured comprehensive inclusion of each detail in a manner that adhered to solicitation requirements and [Coast Guard] standards.

Id. at 1883-84; accord id. at 782.  [. . .], Harkcon's [. . .], asserts that during Harkcon's post-award debriefing he was told by Mr. Mann-Thompson that "staffing was the only issue" with Harkcon's proposal, that it "was the best written proposal" among those submitted, that "TTSS performance was irrelevant to the RFP," and that "if Harkcon had really believed a proposed staff member should receive credit for his or her experience, Harkcon should have submitted that as a question during the solicitation's Question and Answer period."  Id. at 1028-29.  Mr. Mann-Thompson did not subsequently corroborate this statement, but indicated that his impression following the TET's review of the proposals was that the TET "appeared to be more comfortable" with Harkcon than any other offeror, and so "[i]f there was actually any bias, it would have been bias in favor of Harkcon."  Id. at 1432.

### b.  Metris

With respect to Metris's proposal, the TET found the following numbers of strengths, weaknesses, and deficiencies:

| Finding | Subfactor 1 Technical Approach | Subfactor 2 Management Approach | Subfactor 3 Staffing Approach | Subfactor 4 Transition Planning | Subfactor 5 Sample Tasks |
|---|---|---|---|---|---|
| Strength | 4 | 3 | 1 | 1 | – |
| Weakness | 1 | – | 1 | – | – |
| Significant Weakness | – | – | – | – | – |
| Deficiency | – | – | – | – | – |

Id. at 776; see also id. at 785-87, 1888-90 (discussing the individual items in detail).

The weakness that the TET identified in Metris's technical approach was that Metris's proposed use of a SharePoint site "has potential benefits for the Coast Guard, [but] also poses risks related to cyber threats and computer security requirements" because all entities, whether internal or external to the Coast Guard, must "maintain compliance with all regulations and computer security requirements."  Id. at 787, 1890.  With respect to the staffing approach, the TET found the letters of intent for key personnel, which were not required, to be a strength, but some mislabeling of charts and tables regarding the location of Site Team Leads was a weakness

because it required clarification concerning the various service locations.  Id. at 787, 1889-90.
The TET explained:

> The overall risk is rated low due to having no significant
> weaknesses or deficiencies.  [Metris] provides many strengths.  . . .

> The individuals identified as site team leads are strong
> candidates who possess extensive experience in Coast Guard
> training.  [Metris] demonstrates an understanding of the
> requirements of this solicitation by providing well established roles
> and responsibilities.  This will benefit the [Coast Guard] by
> minimizing the amount of oversight needed to ensure PWS
> requirements are met.  . . .  [Metris's] proposed Program Manager .
> . . has recent expertise and an understanding of the [Coast Guard
> training] program and FORCECOM SOPs.  This will translate to
> functionally seamless transition of ongoing initiatives, yielding low
> risk to the [Coast Guard] and benefiting the [Coast Guard] by
> applying the Program Manager's experience and SOP expertise to
> FORCECOM work.

> Some charts and tables were mislabeled but do not increase
> the risk of successful execution.  . . .

> . . . [Metris] demonstrates an understanding of technical
> writing services, with processes established to support [Coast
> Guard] success.  . . .

> [Metris] provided a clear response to . . . Sample Task
> Order examples[, which] featured comprehensive inclusion of each
> detail in a manner that adhered to solicitation requirements and
> [Coast Guard] standards.

Id. at 1890-91; accord id. at 787-88.

## 2.  Past Performance

The Past Performance Evaluation Team was required to evaluate "relevant past
performance . . . by querying the Past Performance Information Retrieval System (PPIRS),
obtaining information from references listed in the proposal . . . and [through] other means as
required."  Id. at 219.  This team was led by Mr. Mann-Thompson, and also included Mr.
Boucher.  Id.

Harkcon's past performance was rated "Exceptional" based on its PPIRS records, its
references, and the PPIRS records for the prime contractor on the TTSS contract:

> Harkcon's past performance contained several PPIRS records
> illustrating exceptional past performance with some records
> reaching a total dollar value of [. . .].  The . . . task order records
> for [the TTSS contract], which is valued at approximately [. . .],
> reflects exceptional and very good ratings.

Id. at 794.

Metris's past performance was rated "Very Good" based on its references and on the work share anticipated by its subcontractors:

> Metris's proposal provides a percentage "work share" breakdown
> of its subcontractors. . . .  Metris indicates that they will be
> performing [. . .] of the work share . . . .  In conclusion, sub-
> contractors performing [. . .] of the work share are rated with
> exceptional past performance and [. . .] of the work share
> performed by Metris is rated with very good past performance,
> which equates to [. . .] of the work share being completed by the
> Offeror and sub-contractors with very good and exceptional past
> performance ratings . . . .

Id. at 798.  [. . .], [. . .], and [. . .] were rated "Exceptional," "Neutral," and "Very Good," respectively, on their past performance.  Id. at 791, 794, 798.

### 3.  Price

The Price Evaluation Team was tasked with "conducting a price analysis of the price proposal."  Id. at 219.  This team was led by Mr. Mann-Thompson, and also included Mr. Boucher and Lieutenant Commander Nathan Cowall from FC-Bop.  Id.  It compared the IGCE of [. . .], id. at 802, with the total evaluated price for each proposal, as follows:

[. . .]

Id. at 799-802.

### 4. Final Decision

The evaluations of each proposal were summarized in the Award Memorandum:

| Offeror | Technical and Management Approach Rating | Risk | Relevant Past Performance Rating | Total Evaluated Price |
|---|---|---|---|---|
| [. . .] | Unsatisfactory | High | Exceptional | [. . .] |
| Harkcon | Marginal | Moderate | Exceptional | [. . .] |
| [. . .] | Unsatisfactory | High | Neutral | [. . .] |
| Metris | Good | Low | Very Good | [. . .] |
| [. . .] | Unsatisfactory | High | Very Good | [. . .] |

Id. at 804.  Three proposals—those submitted by [. . .], [. . .], and [. . .]—were determined to "not represent the overall best value to the [Coast Guard]" because, despite their strengths and past performance ratings, there were two other offerors—Harkcon and Metris—that submitted proposals that were rated technically superior and provided a lower price.  Id. at 804-05.

The Coast Guard summarized Harkcon's evaluation as follows:

> This Offeror had six strengths . . . includ[ing] an "instructor college" which would [have] standardized the quality of contract instructors and government instructors, . . . a "no cost" Training Advisory Group[,] and . . . a third party evaluated vulnerability assessment (placed in the top 15% of all security programs). However, the Offeror proposed five people that failed to meet the key personnel requirements set forth in the solicitation, including the Program Manager.  The TET mentions [that] proposed individuals have significant [Coast Guard] experience and/or [have] attained certain qualifications; however, this does not mitigate the Offeror's deficiency in proposing qualified persons. Therefore the proposal demonstrates a shallow understanding of the staffing requirements necessary for minimal but acceptable contract performance, but correction would not require a major revision or redirection of the proposal. . . . [D]espite the offer having six strengths and Exceptional past performance, there was one offeror rated technical[ly] higher with a lower price. Therefore, the proposal . . . does not represent the overall best value to the [Coast Guard].

Id. at 804.

The Coast Guard summarized Metris's evaluation as follows:

> Metris was the only Offeror with no deficiencies, moreover, Metris proposed qualified Key Personnel—no other Offeror successfully accomplished this requirement.  The Offeror had nine strengths ranging over four sub-factors.  The Offeror will conduct a higher frequency (than required) of inspections in the execution of training safety services; provide an individual who is certified to conduct accreditation assessment for [the Federal Law Enforcement Training Accreditation Board ("FLETA")], which will assist [the Coast Guard] in its ability to meet FLETA requirements; have an established team (functioning HR interoperability) that achieves full staffing and streamlines communication; . . . proposed a Six Sigma Greenbelt certified Team Lead at [TRACEN] Yorktown, which can enhance quality assurance and quality control process for ISD projects; has an established best practices [system] to retain employees, mitigating the delays and challenges of filling vacant positions; provid[ed] letters of intent for proposed site leads; and provided an in depth process to fill vacancies, which was supported by examples of how they executed requirements to a 100% staffing level within a defined transition period.  The Offeror had two weaknesses . . . .  Both issues can be addressed at the post award orientation.  Metris['s] past performance was rated as Very Good.  . . .  [Metris] was the highest technically rated, possessed Very Good past performance, and was the lowest price.  The proposal submitted by Metris LLC does represent the overall best value to the [Coast Guard].

Id. at 805-06.  The Coast Guard further determined that Metris's proposed price was "fair and reasonable" based on adequate price competition in accordance with FAR 15.403-1(c)(1), id. at 806, and that Metris is a "responsible contractor," id. at 807.

The Coast Guard approved the award of the TASS contract to Metris on March 8, 2016, id. at 764, and officially awarded contract number HSCG23-16-D-PFC999 to Metris on March 23, 2016, id. at 808.  Harkcon was notified of the award to Metris that same day.  Id. at 901.

### G.  Procedural History

### 1.  First Bid Protest

After a debriefing on March 28, 2016, Harkcon filed a protest with the United States Government Accountability Office ("GAO") on April 1, 2016.  Id. at 874, 882.  A stop-work order was issued on April 4, 2016.[21]  Id. at 1978.  Harkcon's protest rested on three grounds: (1) an actual or apparent organizational conflict of interest ("OCI") pursuant to FAR 9.505 based on Captain Bruce's employment with Metris, (2) violation of the PIA, and (3) violation of FAR 15.305(a) in the Coast Guard's technical evaluation of Harkcon's proposal.  Id. at 875-76.  On April 15, 2016, the Coast Guard announced it would take corrective action in the form of an investigation into Harkcon's OCI and PIA allegations.  Id. at 1230.  Accordingly, despite Harkcon's objections, the GAO dismissed the protest as academic on April 21, 2016.  Id. at 1230-31.

### 2.  Corrective Action Investigation

On May 27, 2016, Michael Derrios, the Coast Guard Head of Contracting Activity, directed Romeo Rigor to conduct a "single-officer standard investigation" under the Coast Guard Administrative Investigations Manual ("AIM")[22] into "all the circumstances surrounding the alleged OCI and PIA violations" related to the TTSS contract and the TASS procurement.  Id. at 1232; see also AIM 3-9 (table comparing standard, formal, and court-of-inquiry investigations).[23] The AIM provides that a standard administrative investigation "should"—as opposed to must— be conducted by an individual "of at least equivalent rank (or civilian pay grade), and preferably senior to, any persons whose conduct is subject to inquiry."  Id. at 3-5.  Further, although there is a preference for commissioned officers, enlisted personnel and civilians are authorized to conduct standard investigations.  Id.  As a civilian, Mr. Rigor was not authorized to administer oaths, see id. at 4-1 (providing that only "[a]ctive duty personnel, or personnel performing inactive duty training" have authority to administer oaths, and only in certain situations), nor would he have been required to do so, see id. (explaining that testimony "may" be given under oath).

As the investigating officer, Mr. Rigor was "free to determine and use the most effective methods of collecting, analyzing, and recording all relevant information," including whether to interview witnesses "by personal interview, correspondence, telephone inquiry, or other means."

---

[21]  Pursuant to Rule 201 of the Federal Rules of Evidence, the court takes judicial notice of the fact that April 4, 2016, was the next business day following April 1, 2016.

[22]  U.S. Coast Guard, Administrative Investigations Manual: COMDTINST M5830.1A (Sept. 2007), http://www.uscga-district-7.org/PDF/legal/Administrative%20Investigations%20Manual%20COMDTINST%205830.1A.pdf.

[23]  The AIM is separately paginated by chapter.  For example, page 3-9 of the AIM is the ninth page of the third chapter.

Id. at 4-2; see also id. at 4-5 (explaining that although "[i]n-person interviews are the most effective means to obtain witness statements," other means, including telephone interviews, are permissible). According to the AIM, summaries of verbal interviews are more effective than written statements from witnesses because "witnesses frequently provide more information in verbal interviews than . . . in the written statements." Id. at 4-5. In particular, when a "known or potential claim against the United States" is involved (as is the case here), investigating officers are directed to "not ask for a written statement" from witnesses, and instead "shall only prepare a summary of interview."[24] Id. at 4-6.

During the investigation, Mr. Rigor "gather[ed] evidence and witness statements to support facts and formulate opinions." AR 1234. Over the course of several months, he examined documents, conducted interviews, reviewed electronic-mail messages, and inspected computer access logs. See id. at 1342-45. At the conclusion of the investigation, Mr. Rigor provided 556 findings of fact spanning 104 pages, see id. at 1234-337, buttressed by 137 exhibits spanning 1288 pages, see id. at 1342-45 (exhibits table of contents), 1346-2633 (exhibits), to support his opinions and conclusions, see id. at 1234, 1337-41.

In pertinent part, Mr. Rigor opined:

- The business portion of contract management was handled by the FC-B, including COR functions on the overall TTSS contract, with the FC-T providing technical expertise and site-level COR functions. Task order invoicing was performed by the on-site CORs in coordination with the overall TTSS COR from the FC-B. Id. at 1337-38.

- Captain Bruce had limited access to nonpublic performance information regarding the TTSS contract. To the extent he had access to such information, it was not competitively useful. With respect to the TTSS contract, he had no access to Contractor Performance Assessment Report records, the Workflow Imaging Network System, the Contract Information Management System database, or monthly invoices. Id. at 1338.

- Captain Bruce did not have access to Harkcon's nonpublic, procurement-sensitive documents regarding the TTSS contract, and none were provided to him. Id. at 1338-39.

---

[24] The AIM distinguishes between "Coast Guard" and "Non-Coast Guard" witnesses, and permits written statements from the latter when claims against the federal government are involved. AIM 4-6. However, all of the witnesses interviewed by Mr. Rigor are "Coast Guard" witnesses for purposes of the AIM. See id. (defining a "Coast Guard" witness as "a Coast Guard member, employee, Auxiliarist, contractor, or agent").

- Captain Bruce did not access Harkcon's labor category rates for the TTSS contract.  Id. at 1338.

- Although Captain Bruce may have been able to view the composite labor category rates for three FORECOM contracts, there is no evidence that he actually accessed them.  Even if he did so, such information would not have been competitively useful because the composite labor category rates were outdated and were generally subject to public Service Contract Act wage determinations.  Further, site-level labor category rates and Service Contract Act wage determinations were publicly available.  Id. at 1338-39.

- Captain Bruce's oversight of the TTSS contract was minimal. Any current and future FORCECOM training issues, needs, and requirements to which he may have had access were not nonpublic information.  Specifically, the TASS procurement "was awarded based on the future training needs and requirements information publicly disclosed in the [RFI] and contained in the [RFP]."  Id. at 1339.

- There was no appearance of impropriety because Captain Bruce "did not have knowledge [of] or access to competitively useful non-public information with regard to the [TASS procurement]."  Id. at 1340.

- Captain Bruce "was not heavily relied upon by Metris and did not play a substantial role" in its proposal, serving primarily as a subject-matter expert.  Id.

- Previous Coast Guard contract experience was not required to receive a past performance rating on a response to the RFP.  Id.

- The Coast Guard's refusal to allow Harkcon to correct deficiencies in its proposal was in accordance with the RFP. The RFP provided that the Coast Guard intended to award the contract without holding discussions.  Id.

- There was "no evidence to support the allegation that there was any bias in favor of [Captain] Bruce or that anything improper occurred during the TET" process.  Id. at 1341.

- There was "no evidence to substantiate the allegation that [Captain] Bruce violated the PIA," considering his "limited involvement with the [TASS procurement], his lack of access to the Contractor bid or proposal information or source

selection information, including RFI responses, and his date of retirement from the [Coast Guard]." Id.

- There was "no evidence to substantiate the allegation that Metris violated the PIA through receipt of Contractor proposal information or source selection information from [Captain] Bruce." Id.

- Captain Bruce received an ethics clearance to serve as a program manager on the TASS procurement prior to the RFP's issuance. Metris relied on the ethics clearance in good faith in hiring Captain Bruce. Id.

- There was no reason to question the credibility or integrity of the witnesses interviewed. Id.

Ultimately, Mr. Rigor concluded that Harkcon's allegations were meritless:

My investigation revealed no tangible evidence supporting the alleged OCI and PIA violations set forth in [Harkcon's bid protest]. There was no evidence discovered to support the allegation that the hiring of [Captain Bruce] by Metris, LLC resulted in an appearance of impropriety. Additionally, there was no evidence discovered to support the allegation that [Captain] Bruce shared competitively useful non-public information with Metris, LLC. Moreover, there was no evidence discovered to support the allegation that there was bias in this procurement. Finally, there was no evidence discovered to substantiate the alleged PIA violations with regards to [Captain] Bruce or Metris, LLC.

Id. at 1234.

Upon reviewing Mr. Rigor's report, Mr. Derrios noted: "In making the award, the contracting officer implicitly determined that there was no OCI present. In making the appointment of an investigating officer, I reserved to myself the review of that award determination with the express intent of ensuring that there is no appearance of impropriety." Id. at 2637. Mr. Derrios concluded that there was/were:

- "no evidence" to support an allegation of "substantial involvement" by Captain Bruce in the TASS procurement, thus no conflict of interest;

- "no evidence" of Captain Bruce "having access to confidential financial information" regarding the TASS procurement;

- no improper actions by Metris in recruiting Captain Bruce or other employees;

- no improper actions by Captain Bruce in his discussions with other Metris employees;

- no access by Captain Bruce to "non-public information that would provide an unfair competitive advantage," i.e., no "unequal access to operational information that must be remedied in order to have a fair and informed competition";

- "no evidence" that Captain Bruce had access to "confidential bid or proposal information or source selection information" and "certainly no evidence that he wrongfully disclosed such information," and thus no violations of the PIA; and

- no employment of Captain Bruce by Metris until after his separation from the Coast Guard, and thus Captain Bruce "was not a part of the Coast Guard chain of command when he was hired by Metris."

Id. at 2635-36.  Accordingly, Mr. Derrios found that "there was no actual or apparent impropriety" in the Coast Guard's award of the TASS contract to Metris, and described Harkcon's allegations as "speculative and without merit."  Id. at 2637.

### 3. Reaffirmation of Award and Subsequent Litigation

Following the investigation's conclusion, the Coast Guard reaffirmed its award to Metris on December 5, 2016.  Id. at 2638-39 (letter from contracting officer Nathan Dolezal to Harkcon Chief Executive Officer Kevin Harkins).  After a debriefing, Harkcon filed a second bid protest with the GAO on December 23, 2016.  Id. at 2640, 2659.  Harkcon based its second protest on the same grounds as its original protest, and also alleged that the corrective action investigation was inadequate.  Id. at 2642-43.

The GAO denied Harkcon's second protest on March 30, 2017, id. at 3097, and Harkcon filed the instant bid protest on April 12, 2017.  The administrative record was filed on April 28, 2017.  Harkcon moved to supplement the administrative record, and after expedited briefing on that motion, the court denied Harkcon's request on May 17, 2017.  See Harkcon, Inc. v. United States, No. 17-508C, 2017 WL 3392396 (Fed. Cl. May 17, 2017).  Harkcon moved for judgment on the administrative record on May 26, 2017.  The parties subsequently filed and briefed cross-motions for judgment on the administrative record, and the court heard oral argument on July 12, 2017.  The parties then filed memoranda of law, pursuant to their request, regarding additional authority that was raised during oral argument.  The motions are now ripe for adjudication.

## II.  STANDARD OF REVIEW

The United States Court of Federal Claims ("Court of Federal Claims") possesses "jurisdiction to render judgment on an action by an interested party objecting to . . . the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement," 28 U.S.C. § 1491(b)(1) (2012), and may "award any relief that the court considers proper, including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs," id. § 1491(b)(2).  In bid protests, the Court of Federal Claims reviews the procuring agency's action pursuant to the standards set forth in 5 U.S.C. § 706.  28 U.S.C. § 1491(b)(4).  Although section 706 contains several standards, "the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A):  a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"  Banknote Corp. of Am. v. United States, 365 F.3d 1345, 1350 (Fed. Cir. 2004); accord Per Aarsleff A/S v. United States, 829 F.3d 1303, 1309 (Fed. Cir. 2016).  The "arbitrary and capricious" standard is "highly deferential" and requires courts to sustain agency actions that demonstrate "rational reasoning and consideration of relevant factors."  Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000).  In other words, reviewing courts conduct a "rational basis" review of the agency action at issue, rather than an "independent de novo assessment."  Turner Constr. Co., Inc. v. United States, 645 F.3d 1377, 1384-85 (Fed. Cir. 2011) (internal quotation marks omitted).  Under this standard, the court

> may set aside a procurement action if (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.  A court reviews a challenge brought on the first ground to determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis.  When a challenge is brought on the second ground, the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations.

Centech Grp., Inc. v. United States, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (citations and internal quotation marks omitted).  Generally, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."[25]  Camp, 411 U.S. at 142; accord Axiom Res. Mgmt., Inc. v. United States, 564 F.3d 1374, 1381 (Fed. Cir. 2009).

---

[25]  An administrative record typically contains the materials developed and considered by an agency in making a decision subject to judicial review.  See Camp v. Pitts, 411 U.S. 138, 142-43 (1973) (remarking that an agency's finding must be "sustainable on the administrative record made" by the agency at the time of its decision); Cubic Applications, Inc. v. United States, 37 Fed. Cl. 345, 349-50 (1997) ("[T]he primary focus of the court's review should be the materials that were before the agency when it made its final decision.").

If the court finds that "the government acted without rational basis or contrary to law when evaluating bids and awarding the contract," it must then "determine, as a factual matter, whether the bid protester was prejudiced by that conduct." Bannum, Inc. v. United States, 404 F.3d 1346, 1351 (Fed. Cir. 2005). A bid protester demonstrates prejudice by "show[ing] that there was a 'substantial chance' it would have received the contract award" absent the error found by the court. Id. at 1353; see also Linc Gov't Servs., LLC v. United States, 96 Fed. Cl. 672, 695-97 (2010) (distinguishing "allegational prejudice" required to establish standing from the "prejudicial error" required to prevail on the merits).

## III. ANALYSIS

Harkcon challenges the Coast Guard's award of the TASS contract to Metris based on an actual or appearance of impropriety resulting from "an unequal access to information" OCI pursuant to FAR 3.101-1 and FAR 9.505 and/or violation of the PIA, as well as a flawed technical evaluation of Harkcon's proposal in violation of FAR 15.305(a). Mem. Supp. Pl.'s Mot. J. Admin. R. ("Harkcon Mem.") 2, 18. Harkcon further contends that deficiencies in the corrective action investigation demonstrate that the Coast Guard's decision to award the TASS contract to Metris was "inconsistent with the FAR and without a rational basis." Id. at 23-24. Metris argues that there is "no evidence to support Harkcon's contention that the methodology employed by the investigating officer was deficient or unreliable" and, to the extent that there was any deficiency therein, it was harmless and resulted in no prejudice. Def.-Int.'s Reply Supp. Mot. J. Admin. R. ("Metris Reply") 8. In addition, defendant asserts that the Coast Guard "followed the announced evaluation factors," "did not deviate from the evaluation scheme announced in the solicitation and Source Selection Plan," and "followed all applicable procurement regulations in its evaluation of Harkcon's proposal." Def.'s Cross-Mot. J. Admin. R. & Opp'n to Pl.'s Mem. Supp. Mot. J. Admin. R. ("Gov't Mot. & Opp'n") 17-18.

### A. There Was No Impropriety or Appearance of Impropriety

According to Harkcon, Metris should have been disqualified from the competition because of "at least an appearance of impropriety." Harkcon Mem. 28. Harkcon appears to generally concede that Mr. Rigor's conclusion concerning lack of an actual OCI or violation of the PIA was rational, and focuses on the appearance of an impropriety rather than pointing to any evidence of an actual impropriety. See id. at 29-30 ("Indeed, it seems that the approach taken in the Report is to develop facts bearing on whether there was an actual OCI or violation of [the] PIA, and then concluding, on the basis of such facts, that it did not appear there was such an actual impropriety, and inappropriately concluding on that basis there was no appearance of impropriety. . . . '[A]ppearance of impropriety' is a . . . separate and distinct legal concept from an actual impropriety . . . .").

An appearance of impropriety is addressed in FAR 3.101-1:

> Government business shall be conducted in a manner above
> reproach and . . . with complete impartiality and with preferential
> treatment for none.  . . .  The general rule is to avoid strictly any
> conflict of interest or even the appearance of a conflict of interest
> in Government-contractor relationships.  . . .

Harkcon argues that the small disparity in total evaluated price between itself and Metris gives
rise to an appearance of impropriety, given Captain Bruce's involvement and that the total
evaluated prices of the other three offerors were significantly higher.  See Pl.'s Reply & Opp'n
Supp. Pl.'s Mot. J. Admin. R. & Resp. to Def.'s & Def.-Int.'s Cross-Mots. J. Admin. R.
("Harkcon Opp'n") 23 ("[T]he pricing for Metris, a non-incumbent who had never worked with
the [Coast Guard], cannot logically have been derived without insider information . . . .").

Harkcon posits that "Captain Bruce's involvement in the development of the internal
pricing for the solicitation" gave Metris an unfair competitive advantage, Harkcon Mem. 33, a
concept that is defined in FAR 9.505(b):

> [A]n unfair competitive advantage exists where a contractor
> competing for award for any Federal contract possesses—
>
> (1)  Proprietary information that was obtained from a Government
>      official without proper authorization; or
>
> (2)  Source selection information (as defined in [FAR] 2.101) that
>      is relevant to the contract but is not available to all
>      competitors, and such information would assist that contractor
>      in obtaining the contract.

Accord PAI Corp. v. United States, 614 F.3d 1347, 1352 (Fed. Cir. 2010) ("A significant
potential conflict is one which provides the bidding party a substantial and unfair competitive
advantage during the procurement process on information or data not necessarily available to
other bidders.").  Further, while Harkcon acknowledges that Captain Bruce "avoided a problem
with 18 U.S.C. § 207(a)" because his work with Metris involved behind-the-scenes assistance,
Harkcon also avows that Captain Bruce's "being shown in such a prominent way in Metris's
proposal is tantamount to a representational appearance or communication," thus giving rise to
"at least an appearance of impropriety which compromises the integrity of the procurement
process."  Harkcon Mem. 33-34.

Harkcon relies on NKF Engineering, Inc. v. United States, 805 F.2d 372, 376-77 (Fed.
Cir. 1986), for the proposition that an appearance of impropriety, standing alone, can be a
sufficient basis to disqualify an offeror.  Harkcon correctly states the law, but its reliance on
NKF Engineering—in which an offeror was disqualified by the contracting officer based solely
on an appearance of impropriety, id. at 376—is misplaced.  In NKF Engineering, the disqualified
offeror had reduced its proposed price by 33 percent after the agency required all offerors to

submit cost revisions; no other offeror decreased its price by more than 19 percent.  Id.  The United States Court of Appeals for the Federal Circuit ("Federal Circuit") found that the contracting officer's disqualification decision was not irrational because an individual who "had been actively involved" and was "a major cog in the bid process, with access to much relevant information" announced his retirement and took a job with the disqualified offeror before the contract was awarded.  Id. at 376-77.

The instant case is easily distinguished from NKF Engineering for three reasons.  First, there were no revisions, of price or any other type, during the TASS procurement.  The Coast Guard adhered to its initial determination to award the contract without holding discussions.  Second, Captain Bruce was not a "major cog" in the TASS procurement, nor did he have access to any relevant information regarding the process.  Although he was copied on certain electronic-mail messages during the early stages of the TASS procurement in the summer of 2014, Captain Bruce was merely one of several FORCECOM stakeholders made generally aware of the TASS procurement.  See AR 1567-74.  No evidence suggests that he was in any way actively involved in preparing or guiding the preparation of the RFP.  In fact, the Coast Guard's investigation determined that the only competitively useful information that Captain Bruce may have actually accessed was in the public domain; to the extent that Captain Bruce had the ability to garner competitively useful nonpublic information, he did not do so.  Third, Captain Bruce retired from the Coast Guard before the Source Selection Plan was finalized, the RFP was issued, or the contract was awarded.  Thus, although NKF Engineering stands for the legal proposition that an appearance of impropriety can be sufficient grounds to disqualify a bidder, the facts of this case do not give rise to such a suggestion, much less a finding.

Harkcon avers that the Coast Guard's investigation was flawed because, among other reasons, Mr. Rigor failed to describe standards for an appearance of impropriety.  However, as the Federal Circuit observed in NKF Engineering, whether there is an appearance of impropriety that would support disqualifying a bidder "depend[s] upon the circumstances in each case."  802 F.2d at 376.  For instance, FAR 9.508 provides several examples of "situations in which questions concerning organizational conflicts of interest may arise," but includes the caveat that "[t]hey are not all inclusive."  None of the examples in FAR 9.508 is applicable to this case.  Precedent teaches that an appearance of impropriety can arise in several contexts besides the situation described in NKF Engineering, including, but not limited to:

- possessing the proprietary information of another bidder, Career Training Concepts, Inc. v. United States, 83 Fed. Cl. 215, 234 (2008);

- attempting to obtain proprietary proposal information of another bidder, even when no such information is actually obtained, Compliance Corp. v. United States, 22 Cl. Ct. 193, 203 (1990), aff'd, 960 F.2d 157 (Fed. Cir. 1992) (unpublished table decision);

- actual or apparent conflicts of interest, Turner Constr., 645 F.3d at 1387; and

- bias and/or prejudice, Commc'n Constr. Servs., Inc. v. United States, 116 Fed. Cl. 233, 275 (2014); Avtel Servs., Inc. v. United States, 70 Fed. Cl. 173, 221 (2006).

Thus, it would have been impossible for Mr. Rigor to, before conducting the investigation, delineate what he might find that would constitute an appearance of impropriety.

An appearance of impropriety must be based on "hard facts" rather than "suspicion and innuendo." CACI, Inc.-Fed. v. United States, 719 F.2d 1567, 1581-82 (Fed. Cir. 1983); accord Turner Constr., 645 F.3d at 1387. Mere "conjecture" is insufficient. Jacobs Tech. Inc. v. United States, 100 Fed. Cl. 198, 218 (2011). The Federal Circuit has explained that there is no appearance of impropriety when "[a] disinterested observer knowing all the facts and the applicable law would see nothing improper." R & W Flammann GmbH v. United States, 339 F.3d 1320, 1324 (Fed. Cir. 2003). Accordingly, there is a distinction between obtaining information that is publicly available, id., and obtaining proprietary information, Career Training Concepts, 83 Fed. Cl. at 234. In addition, courts have previously found no appearance of impropriety when, for example:

- a technical evaluator was listed as a past performance reference;

- alleged access to offices, participation in meetings, and roles in the development of databases were insufficient to show that specific proprietary information had been obtained; and

- relief was sought "because of how [the procurement] looked, not because of how it was."

Commc'n Constr. Servs., 116 Fed. Cl. at 275 (alteration in original) (collecting cases).

Here, there is ample evidence supporting Mr. Rigor's conclusion that Metris neither obtained nor attempted to obtain any of Harkcon's proprietary information. Although Harkcon submitted its RFI response while Captain Bruce was on active duty as the FC-T division chief, the timing of the RFI submission fails to establish any appearance of, or actual, impropriety; assuming, contrary to the record, that Captain Bruce accessed the RFI responses, he would not have acquired any competitively useful information because the RFI merely requested general statements of capability and comments to the draft PWS. Further, as Metris observed, the Coast Guard completed the Source Selection Plan and issued the RFP after Captain Bruce left the Coast Guard. Thus, the instant case is not a situation where "it appears that a bidder may have prepared its bid proposal with knowledge of its competitor's bid, [and] such an appearance taints the integrity of the procurement process, regardless of whether any proprietary information was actually obtained or used." Compliance, 22 Cl. Ct. at 203.

The extent of Harkcon's proprietary information to which Captain Bruce—and by extension, Metris—potentially had access is Harkcon's labor category rates for the now-expired TTSS contract on which it was a subcontractor.  The only hard fact upon which Harkcon can rely to support its assertion of an appearance of impropriety is Metris's total evaluated price relative to Harkcon and the other bidders, which price Harkcon contends "cannot logically have been derived without insider information."  Harkcon Opp'n 23.

However, a reasonable observer "knowing all the facts," R & W Flammann, 339 F.3d at 1324, could logically arrive at a different conclusion.  Metris reports composing its pricing scheme by relying on one of its subcontractor's "insight into developing cost rates for [Service Contract Act] proposals, including rate development and [Service Contract Act] compliance on training contracts" as well as by examining public data concerning Service Contract Act compliance issues with the incumbent prime contractor.  AR 2552, 2557-59.  Captain Bruce had "no involvement" in developing the pricing portion of Metris's proposal, having "only worked on limited portions" of the technical portion.  Id. at 2559.

In any event, the individual labor category rates that make up the total evaluated prices tell a different story than the version advanced by Harkcon.  Out of forty-seven total labor categories, there were none for which Metris and Harkcon submitted the same rate, and Metris's rate differed by at least ten percent from Harkcon's rate for the first year of contract performance in thirty-two of the categories.[26]  Compare id. at 545-46 (Harkcon's labor category rates), with id. at 738-39 (Metris's labor category rates).  Adjusting for duplications in rates,[27] there were twenty-eight unique comparable rates.  Metris's rate was lower than Harkcon's in sixteen of the comparable categories, and higher in the remaining twelve.  There was at least a ten percent difference in Metris's rate from Harkcon's rate in a majority (fifteen out of twenty-eight) of the unique labor category rates.  In sum, although Metris's total evaluated price was only 1.4 percent lower than Harkcon's total evaluated price, the individual components of that total varied significantly.

Similar to the total evaluated price, the TET composition does not give rise to an appearance of impropriety.  Although the TET members had varying degrees of familiarity with Captain Bruce, none was close to him or had ever reported to him.  Commander Ramassini indicated that he "knew at least one person on each proposal," which was not unusual in and of itself because "Coast Guard training is a small community."  AR 1470; accord id. at 2579 (Chief Stewart remarking that he "[t]ended to know someone on pretty much all of the proposals" and that it "[s]eemed like [all offerors] had someone who was from Coast Guard training").  Commander Ramassini noted that [. . .] also listed a former FC-T division chief as program manager in its proposal, which did not cause any concern.  Id. at 1470.  Ms. Thore also expressed

---

[26]  Labor category rates for subsequent years are based on the first-year rates.

[27]  For example, in both the Training Aid Support Engineer Weapons Simulations (Small Arms) and Training Aid Support Engineer Weapons Simulations (Boats) labor categories, Metris's rate was [. . .] while Harkcon's rate was [. . .], a 22.4 percent difference.  Compare AR 546, with id. at 739.  Due to the similarity in these two labor categories, as well as other labor categories to one another, the duplication is unsurprising.

"[n]o concerns" regarding Captain Bruce because there were "a number of people in different proposals who were prior Coast Guard." Id. at 2564.  Mr. Boucher similarly reported a lack of concern, explaining that there are "a lot of ex-military [personnel] on the proposals." Id. at 1422.

The instant case is somewhat analogous to a past performance reference serving on an evaluation panel, which the Federal Circuit determined, without more, "does not constitute proof of a conflict of interest." Galen Med. Assocs., Inc. v. United States, 369 F.3d 1324, 1335 (Fed. Cir. 2004).  In both Galen and the instant case, the successful offeror had ties to members of the evaluation team.  In Galen, however, where those ties were more extensive than the instant case (i.e., serving as a reference for a particular individual as opposed to merely knowing that person), the Federal Circuit declared that it would be improper to "penalize [a contractor] simply for [its] experience and familiarity with the agency." Id. (internal quotation marks omitted).  In the case at bar, it would similarly be improper to penalize Metris or Harkcon on that basis.[28]  Further, Commander Ramassini explained that the TET's evaluation work "was very data driven and based on pros and cons of comparison of resumes to the criteria in the RFP," noting that during discussions concerning staffing approaches the TET "took name[s] away and talked only about [a particular individual's] resume experience and if it met the RFP requirements." AR 1471.

The instant case is also analogous to Jacobs Technology, in which the "integrity of the procurement process" was called into question by allegations that "access to offices, participation in meetings, and roles in development and maintenance of databases and websites" led to the acquisition of "non-public source selection information." 100 Fed. Cl. at 218.  In that case, the Court of Federal Claims stated that those allegations were simply "conjectures" that failed to "rise to the level of facts" as in NKF Engineering and Compliance. Id. Here, Harkcon avows that "[i]t strains credulity in light of [his] leadership responsibilities that Captain Bruce" did not have access to its proprietary information concerning the TTSS contract, Harkcon Opp'n 19, rather than pointing out specific facts demonstrating that Captain Bruce accessed such information.  However, Mr. Rigor specifically found that although Captain Bruce properly had access to certain SharePoint portal sites based on his position, he did not have access to the particular site housing the TTSS contract and TASS procurement information, nor did he have access to other sources of data concerning TTSS contract performance. AR 1267-70.  Simply put, Captain Bruce was not privy to any of Harkcon's proprietary information.  Harkcon's reasoning boils down to "suspicion and innuendo" in place of "hard facts," an approach that the Federal Circuit has consistently rejected. See, e.g., Turner Constr., 645 F.3d at 1387; PAI Corp., 614 F.3d at 1352; CACI, 719 F.2d at 1582.

Beyond proprietary information, Mr. Rigor determined that Captain Bruce did not possess any source selection information, particularly the IGCE, which could have given Metris a competitive advantage.  In response, Harkcon avers that the corrective action investigation contained several deficiencies and therefore must be disregarded.  Metris correctly observes that any shortcomings in the investigation, including (but not limited to) non-compliance with the AIM, are "only relevant if . . . the conduct was detrimental to the reliability" of the investigation.

---

[28]  Applied on a broader scale, penalizing contractors for their experience with an agency, e.g., by preventing retired personnel from entering the private sector, would quickly cause federal contracting to grind to a halt.

Metris Reply 5.  To the extent that there were any deficiencies in the investigation, Harkcon has failed to establish that those deficiencies affected the investigation's results or its reliability such that the Coast Guard's decision to reaffirm the TASS contract award to Metris was arbitrary and capricious.  In other words, even if they existed, none of the investigation's alleged deficiencies had any prejudicial effect, and the court need not address them further.

Any competitively useful information that Captain Bruce possessed, such as familiarity with Coast Guard SOPs, was in the public domain.  See, e.g., AR 1476 (observing that Captain Bruce "was not involved to a level where he would have seen any more documents than the other Contractors would have").  There is simply no evidence—only "suspicion and innuendo"—that any proprietary or source selection information was actually obtained, or even sought, by Metris via Captain Bruce or by other means.  Mr. Rigor's conclusion is supported by, among other facts, the breakdown of Metris's and Harkcon's pricing; Captain Bruce's lack of involvement with respect to managing the TTSS contract, the TASS procurement, or the substantive preparation of Metris's bid; and the timing of Captain Bruce's retirement from the Coast Guard.  Further, and perhaps most importantly, Captain Bruce received an ethics memo clearing him to work as a program manager on the new TASS contract, the Coast Guard Legal Command was fully informed of all the relevant facts by Captain Bruce before issuing the ethics memo, and those facts have been verified by the documents examined and witness statements given during the Coast Guard's investigation.

In sum, Captain Bruce's conduct has been completely beyond reproach.  Whether there is an appearance of impropriety depends on the perspective of a reasonable person who is fully informed, R & W Flammann, 339 F.3d at 1324, not from the perspective of a disappointed offeror or another party not privy to, or simply unaware of, relevant data or information.  For instance, that Lieutenant Commander Mark may have been "shell shocked" upon learning that Captain Bruce was listed as Metris's program manager, AR 1394, is of no moment.  His own statement that he believed Captain Bruce "had access to the Contract documents," id., which runs counter to Mr. Rigor's findings concerning Captain Bruce's lack of access to and possession of proprietary and source selection information, shows that he was unaware of pertinent facts.  Further, it does not appear that Lieutenant Commander Mark was aware of Captain Bruce's ethics clearance.  Mr. Parry, who served on the TET, expressed "[s]urprise" that Captain Bruce was allowed to serve as a program manager, but figured that the arrangement had "made it past legal review" and thus he simply "performed the technical evaluations . . . strictly according to the requirements and what was given [in the proposals]."  Id. at 2526-27.

Accordingly, the contracting officer's finding that there was no appearance of impropriety—and no actual impropriety, including no OCI or PIA violation—was neither irrational nor contrary to law.  Under the "'highly deferential' rational basis view" that applies in bid protests, CHE Consulting, Inc. v. United States, 552 F.3d 1351, 1354 (Fed. Cir. 2008) (quoting Advanced Data, 216 F.3d at 1058), overturning a contracting officer's determination that there was no appearance of impropriety should be done sparingly, see, e.g., Jacobs Tech., 100 Fed. Cl. at 217 (declining to find an appearance of impropriety in the absence of a prior determination by the contracting officer).  Because, as explained above, the contracting officer's assessment was not irrational, the court declines to overturn it.

### B.  The Coast Guard's Technical Evaluation Was Not Improper

In addition to alleging at least the appearance of impropriety, Harkcon argues that the Coast Guard violated FAR 15.305(a) in evaluating its technical proposal because it "did not assign equal importance to the five subfactors, and not all subfactors contributed to the overall factor rating," preventing the evaluation from "pass[ing] the tests of rationality and consistency with the RFP's evaluation criteria."  Harkcon Mem. 20.  According to Harkcon, the "lack of guidance" in the RFP concerning how the subfactor ratings contribute to the overall factor rating "constitutes a violation of the applicable regulations and implicates the reasonableness of that evaluation."  Id. at 21.  Harkcon further asserts that the assessment of a deficiency for its proposal in the staffing approach subfactor was unjustified because the five individuals "for whom resumes were found insufficient are serving with distinction on the TTSS contract performing identical duties to those for which they were proposed on the TASS bid, and the [Coast Guard] has admitted they were qualified."  Id. at 23 (citations omitted).  Defendant counters that the Coast Guard's evaluation "was both rational and complied with all applicable procurement procedures."  Gov't Mot. & Opp'n 19.

Proposal evaluation is defined in FAR 15.305(a) as "an assessment of the proposal and the offeror's ability to perform the prospective contract successfully."  As Harkcon emphasizes, FAR 15.305(a) further provides that government agencies must "evaluate competitive proposals and then assess their relative qualities solely on the factors and subfactors specified in the solicitation."  When an evaluation is challenged, then, courts must examine the evaluation "to ensure that it was reasonable and consistent with the evaluation criteria and applicable statutes and regulations," while remaining mindful that the "merit of competing proposals is primarily a matter of agency discretion."  E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed. Cir. 1996) (internal quotation marks omitted).  As explained below, Harkcon's averment concerning the deficiency assessment itself is without merit.  Its averment that a deficiency in one of five "approximately equal" subfactors, AR 381, could not result in an overall "Marginal" rating at the factor level is similarly without merit.

### 1.  It Was Not Unreasonable for the TET to Assess a Deficiency

Harkcon's argument concerning the reasonableness of its deficiency assessment in the staffing approach subfactor reflects a fundamental misunderstanding of the RFP.  The RFP contained the necessary and desired qualifications for various roles, including the Program Manager and Site Team Lead positions (which were designated as key personnel).  For educational requirements, the RFP specified that the Program Manager "[m]ust possess a Master's degree in an Education, Business, Administration, or Management related field[]," and that Site Team Leads "[m]ust possess a Bachelor's degree in an Education, Business, or Management related field."  Id. at 360-61 (emphasis added).  In addition, the RFP provided that the Coast Guard "desires, but does not require" and "[m]ay require" that the Program Manager and Site Team Leads possess other qualifications.  Id.  However, Harkcon's proposal framed the educational requirements as "desired," rather than mandatory, qualifications—perhaps because five of the nine key personnel failed to meet the education guidelines:

- Two candidates lacked at least a bachelor's degree.  Both held various Coast Guard certifications; one of these two also held an Associate of Science degree.

- Three candidates held degrees in disciplines deemed to be outside of the education, business, administration, and/or management fields:  Computational and Applied Mathematics (Statistics), English, and Homeland Security.

- Four candidates held degrees in disciplines deemed to be within the education, business, administration, and/or management fields:  Performance Improvement, Curriculum and Instruction, Criminal Justice/Police Administration, and Educational Technology Leadership and/or Organizational Leadership and Development.[29]  These four candidates met the education requirements specified in the RFP.

That the five candidates failing to meet the education requirements specified in the RFP "have significant Coast Guard experience" and multiple "salient certifications" that "may enhance the services provided to the [Coast Guard]," id. at 782, 1884, is of no moment.  The RFP's use of the word "must," as contrasted with "desires" and "may," was unambiguously compulsory.  Further, the RFP contained specifications that the contract awardee "shall provide qualified personnel . . . in task orders under this Contract," id. at 260 (emphasis added), and agreed to "assign only personnel who are qualified for the applicable labor category," id. at 257.  Harkcon cannot reasonably ascribe a different meaning to these terms.  See Banknote, 365 F.3d at 1353 ("The solicitation is ambiguous only if its language is susceptible to more than one reasonable meaning.").  Even the draft PWS, which was included in the RFI to which Harkcon responded, contained this mandatory language.  Further, neither the draft PWS nor the RFP provided an option for "[e]quivalent educational credentials," AR 34-35, similar to the TTSS contract.  Harkcon was not entitled to unilaterally reframe the educational requirements for key personnel that were clearly described in the RFP at issue.

If Harkcon believed that the RFP contained an error with respect to the educational requirements for key personnel, it was obliged to raise those concerns prior to submitting a proposal.  Harkcon cannot now contend that the Coast Guard's decision to include mandatory educational requirements in the RFP, without a corresponding equivalency option similar to the TTSS contract, is improper.  To the extent that the lack of an equivalency option represented an ambiguity, such ambiguity was patent because it was easily discoverable.  Per Aarsleff A/S, 829 F.3d at 1313.  Contractors who have the opportunity to object to the terms of a solicitation, but fail to do so, are precluded from later raising such objections in a bid protest.  Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308, 1313 (Fed. Cir. 2007); see also Per Aarsleff A/S, 829 F.3d at 1313.  Here, the RFP explicitly provided the contact information for the procuring contracting specialist and contracting officer to facilitate the resolution of any questions prior to the response

---

[29]  One candidate held multiple degrees.

deadline.  Harkcon does not allege that it submitted any sort of protest, much less asked any questions, concerning the RFP prior to responding.  Even when responding to the RFI in 2014, over a year prior to submitting its proposal, Harkcon suggested several improvements to the draft PWS, but failed to comment on the mandatory educational requirements, and concomitant lack of an equivalency option, for key personnel.  In short, Harkcon had ample notice of the educational requirements for key personnel, and ample opportunity to either meet or object to those requirements.

The language of the RFP was unambiguous; to the extent there was any ambiguity with respect to the educational requirements, such ambiguity was patent.  As the TET explained, five of Harkcon's nine candidates for key personnel positions failed to meet the mandatory educational requirements.  [. . .], [. . .], and [. . .] were also assigned deficiencies for similar reasons; Metris was the only offeror to meet the educational requirements for all key personnel. Therefore, the TET's decision to assess a deficiency—i.e., a "material failure" to meet a contract requirement, AR 224, 773, 1873—against Harkcon in the staffing approach subfactor was not irrational.

### 2.  The Deficiency Did Not Improperly Impact Harkcon's Overall Factor Rating

The gravamen of Harkcon's allegation concerning a flawed technical evaluation stems from the relationship of the staffing subfactor to the overall Technical and Management Approach factor.  According to Harkcon, its overall "Marginal" rating with "Moderate" risk was arbitrary and capricious, even assuming the deficiency assessment was proper, considering there were also six identified strengths and no identified weaknesses or significant weaknesses across the remaining four subfactors.  Harkcon relies on FAR 15.305(a)'s directive that proposal evaluations must be based "solely on the factors and subfactors specified in the solicitation," in conjunction with the RFP's guidance that the five subfactors carry approximately equal weight, in support of its position.  Defendant stresses that the Coast Guard's best-value determination was properly within its discretion, and is "entitled to deference" because it was "well-founded and reasonable" as evidenced by the voluminous documentation contained in the record.  Gov't Mot. & Opp'n 12.

That a deficiency rating in one subfactor was purportedly "rolled up" to the factor level does not render the Coast Guard's decision arbitrary and capricious.  The Coast Guard, like any federal agency, is entitled to significant deference in exercising its discretion.  See Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332-33 (Fed. Cir. 2001) (recognizing that bid protesters carry a "heavy burden" of demonstrating that an agency action lacked a rational basis).  The RFP, and the draft PWS before it, explicitly stated that the educational requirements were mandatory via repetitive use of the terms "must" and "shall," contrasted with use of the terms "desires" and "may" with respect to other requirements.  The importance of the key personnel position requirements were repeatedly emphasized in the RFP, and contractors were required to "agree[] to assign only personnel who are qualified for the applicable labor category."  AR 247.  Further, the Coast Guard specified that it would "award a contract to the responsible offeror whose offer conforming to the solicitation will be most advantageous" according to an overall best-value determination.  Id. at 381 (emphasis added). Harkcon cannot escape the fact that, as the TET explained, its proposal simply did not conform

to the solicitation with respect to five of the nine key personnel—a material portion.  It was therefore reasonable for the TET to be concerned with Harkcon's ability to follow contract requirements during the period of performance, and the TET did not act in an arbitrary and capricious manner, or contrary to regulation or law, in assigning an overall "Marginal" technical rating and "Moderate" risk assessment.  In other words, it was "not a departure from the relative importance of the subfactors" that resulted in Harkcon's overall technical rating, but "rather the exacting grading scheme" used by the Coast Guard.  <u>Enhanced Veterans Sols., Inc. v. United States</u>, 131 Fed. Cl 565, 586 (2017).

In <u>Enhanced Veterans</u>, where the procuring agency "rolled up" a deficiency in one equally-important subfactor to the overall factor level, the Source Selection Plan specifically provided for "rolling-up" certain adjectival subfactor ratings to the factor level.  <u>Id.</u> at 585-86.  The Court of Federal Claims upheld the agency decision, noting that "[n]o authority . . . disapproves of the use of such a minimum standard as part of the rating methodology" and that the evaluation documents "discuss[ed] in detail" the ratings assigned.  <u>Id.</u> at 586.  In the instant case, the Source Selection Plan did not specifically provide for the "roll-up evaluation methodology," <u>id.</u>, but neither did it preclude that approach.  Similarly, the TET's failure to assign adjectival ratings to each subfactor did not run counter to the Source Selection Plan because individual ratings were not required, and the TET discussed each subfactor in detail to explain its overall factor rating.[30]  Harkcon's attempt to construe the TET's failure to assign subfactor adjectival ratings as arbitrary and capricious is therefore disingenuous, particularly "considering the binding precedent which rejects the concept of computing an average based on adjectival ratings."  <u>Id.</u>  The holding in <u>Enhanced Veterans</u> emphasized that the "relative importance" of the subfactors, as stated in the solicitation, was not violated because the deficient subfactor was an "equally-important subfactor[]" and the overall evaluation included a detailed explanation of the deficiency:

> It was the substance of these findings, and not the associated labels or the subfactor category in which the significant weakness was discovered, that mattered.  In light of . . . the persuasive precedents showing the outsized influence a poor rating in one of several equally-weighted subfactors may have, the Court cannot find that the roll-up evaluation methodology violated [FAR] 15.305.

<u>Id.</u> (citation omitted).  Because the TET's factor ratings in the action currently before the court similarly took into account each subfactor and were determined in accordance with the Source Selection Plan and the RFP, the TET's conclusions were not irrational.

Harkcon relies on the Coast Guard's statement during the second GAO protest that "Marginal" was the best possible technical rating it could have received after being assigned a deficiency, AR 3052, for its contention that the roll-up methodology was improperly applied to

---

[30]  Harkcon's argument that not all subfactors were considered—because no strengths, weaknesses, significant weaknesses, or deficiencies were assigned to the Sample Tasks subfactor for either Harkcon or Metris—is meritless.  The Coast Guard referenced both offerors' approaches to the sample tasks in discussing their overall technical ratings.

its technical evaluation.  However, Harkcon's reliance on that statement completely ignores its context.  As the Coast Guard explained, a "Marginal" proposal was one that "demonstrate[d] a shallow understanding of the requirements and an approach that does not meet one or more performance or capability standard[s]."  Id. (internal quotation marks omitted).  The Coast Guard further explained that a "Satisfactory" rating would have been improper because Harkcon failed to "meet a 'performance or capability standard' in that five key personnel did not meet the educational requirements."  Id.  In other words, Harkcon's overall technical factor rating was appropriate in light of the definitions for the technical factor ratings as set forth in the Source Selection Plan and the RFP.

Even if the court were to give Harkcon the benefit of the doubt by setting aside the deficiency assessment, or the staffing approach subfactor altogether, doing so would not render the Coast Guard's award of the contract to Metris arbitrary and capricious.  See, e.g., Advanced Data, 216 F.3d at 1058 (declining to overturn an evaluation as "arbitrary and capricious" after affording the protester "the benefit of every inference and potential factual dispute").  Across the remaining four subfactors, Harkcon was assigned six strengths and no weaknesses, significant weaknesses, or deficiencies.  Metris was assigned eight strengths, one weakness, and no significant weaknesses or deficiencies across those same subfactors.  Although assigning ratings is not a mechanical application of strengths and weaknesses, Synetics, Inc. v. United States, 45 Fed. Cl. 1, 7 (1999), the number of strengths and weaknesses, each of which was explained in detail, suggest that the TET's overall rating of Metris as technically superior to Harkcon was not irrational, even had Harkcon received a rating higher than "Marginal."  Further, the Coast Guard explained that the weaknesses identified in Metris's proposal could easily be addressed during the post-award orientation.

As stated in the RFP, the non-price factors—Technical and Management Approach and Past Performance—were significantly more important than price, and were approximately equal to each other.  Harkcon's past performance was rated as "Exceptional," and Metris was rated only one level below at "Very Good."  With Harkcon and Metris each having a higher rating than its competitor in one of the two non-price factors, the price factor became more relevant.  It was therefore not irrational for the Coast Guard to determine that Metris, with a lower total evaluated price by approximately [. . .], represented the overall best value.

## IV.  CONCLUSION

The court has considered all of the parties' arguments.  To the extent not discussed herein, they are unpersuasive, without merit, or are unnecessary for resolving the matters currently before the court.

Metris was the only offeror to submit a proposal that met all of the requirements of the solicitation.  Even absent Harkcon's deficiency, the Coast Guard provided a reasonable explanation for its finding that Metris's proposal was technically superior.  Because Metris also provided the lowest total evaluated price, it was not irrational for the Coast Guard to determine that Metris's proposal represented the overall best value.  Further, the record shows that Captain Bruce acted entirely ethically.  Accordingly, a fully informed, reasonable person would not find an appearance of impropriety.  There was also no actual impropriety, OCI, or PIA violation.

In sum, Harkcon has failed to carry its burden of showing that the Coast Guard's decision to award the TASS contract to Metris was arbitrary, capricious, an abuse of discretion, or contrary to law.  Therefore, the court **DENIES** Harkcon's motion for judgment on the administrative record, and **GRANTS** defendant's and Metris's cross-motions for judgment on the administrative record.  No costs.  The clerk is directed to enter judgment accordingly.

The court has filed this opinion under seal.  The parties shall confer to determine proposed redactions that are agreeable to all parties.  Then, **no later than Friday, August 18, 2017**, the parties shall file a joint status report indicating their agreement with the proposed redactions and **attaching a complete copy of the court's opinion with all redactions clearly indicated**.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge